# POST SIGN COMPANY, INC. v. JEMC'S, INC.
## —342 S. W. (2d) 385.

Eastern Section. September 8, 1960.

Certiorari Denied by Supreme Court January 16, 1961.

Egerton, McAfee, Armistead & Davis, Knoxville, for intervenor, Western Avenue Realty Company, Inc., appellant.

Frank B. Creekmore and Marne S. Matherne, Knoxville, for H. T. Kern, receiver, appellee.

WORLEY, Special Judge. This appeal by intervenor, Western Avenue Realty Company, Inc., is from the action of the Chancellor in decreeing that a purchase money deed of trust note made by one James E. McAshan III, and held by intervenor, is tainted with usury and unjust enrichment to the extent of $45,000, and that the receiver for Jemc's, Inc., present owner of the equity in the property on which the deed of trust was executed, is entitled to have the indebtedness purged of such usury.

The holding complained of occurred during a general creditors' proceeding originally filed against Jemc's, Inc., and James E. McAshan, III, involving a business known

as Dixie Land Drive In Restaurant, for which H. T. Kern was appointed as receiver on January 14, 1959. One Edward S. Clayton filed an intervening petition as a preferred creditor asserting claims under conditional sales contracts, a chattel mortgage on certain equipment, and a trust deed on the property in which the restaurant was operated, which he claimed secured a note in the original amount of $106,524.01. This petition was later amended to show that Western Avenue Realty, Inc., a corporation of which Dr. Clayton is the sole stockholder, is the true and lawful holder of the note referred to. The petition did not assert the debt as a claim but sought an order directing the receiver to surrender possession of the real estate and personal property to permit foreclosure by the Trustee. The receiver answered this intervening petition, asserting that the transaction in which the note for $106,524.01 was executed was tainted with usury to the extent of $45,000, that intervenor had been unjustly enriched to that extent in the transaction preceding the execution of the note, and that the receiver was entitled to have same purged. On May 5, 1959, a consent order was entered approving the sale of the real estate and the restaurant property and equipment in the hands of receiver for a total of $198,085.60 out of which certain preferred claims were paid and the balance impounded pending final adjudication on the question of usury and unjust enrichment which has resulted in this appeal.

While the original bill was filed against both James E. McAshan, III and Jemc's, Inc., the suit was dismissed as to McAshan on January 15, 1959, by decree recited to have been entered ''upon the application of all parties'' and approved by the attorney for general creditors and the receiver, which decree also contains this recital:

"It further appearing from the pleadings and statements of counsel that there is no showing of individual liability on the part of the defendant Mc-Ashan for the debts mentioned in the bill. * * *"

The transaction asserted to be usurious, and as constituting an unjust enrichment, arises under the following circumstances:

On August 28, 1953 Willis and Willard Creech (referred to herein as "Creech Bros.") were the owners of certain real estate and equipment located in Knox County, Tennessee, on which they carried on a business known as Dixie Land Restaurant, and on that date, pursuant to prior negotiations Creech Bros. entered into a written agreement with James E. McAshan, III providing (1) for the employment of McAshan as manager of the Drive-In division of Dixie Land Restaurant from November 1, 1953 to April 1, 1956 at a salary of $125 per week, and (2) an option to McAshan on April 1, 1956 to (a) lease the property until April 1, 1963 for $15,000 payable April 1, 1956 and $1,600 per month thereafter during the term, or (b) to purchase the property for $200,000 payable $75,000 in cash, and the balance at the rate of $1,000 per month, with interest at 6%. McAshan worked under the terms of this agreement until November 1, 1955 and received the salary provided.

On June 24, 1954 the wives of Creech Bros. purchased additional equipment for the Dixie Land Restaurant at a cost of $63,297.37. This equipment was, of course, not included under the August 1953 agreement.

At sometime prior to October 25, 1955, the Creech Bros. became financially embarrassed and were extremely anxious to sell the Dixie Land Restaurant property for

cash. Since the McAshan option to·purchase was then outstanding (but not subject to exercise until April 1, 1956) Creech Bros. first approached McAshan and offered to sell the equity in the real estate to him for $65,000 in cash which McAshan was unable to raise. The Creech Bros. then offered to sell the equity in the Dixie Land property (which was encumbered by a deed of trust to one Busch) to McAshan for $110,000, to be represented by a second deed of trust note payable in monthly install-ments. The note was not actually executed, it being un-derstood that Creech Bros. were· unwilling to accept it unless it could be sold on the open market for cash at some price acceptable to Creech Bros. who employed David Brown, a Knoxville broker, to find a sale at an authorized price of $65,000, agreeing to pay him a com-mission thereon. Brown contacted Edward S. Clayton, a Knoxville physician, who indicated willingness to pur-chase such a note at the price stated, but upon consulting his tax attorney, Clayton was advised that his gain on the purchase of the note would be taxable as ordinary income, but that if Clayton could purchase the property and resell the equity in the same for the $110,000 which McAshan was willing to pay in installments over a period of years, the gain thus realized would be capital gain with resultant tax savings. Under a plan outlined by Clayton's tax attorney, and with Brown as intermediary, the other interested parties agreed to permit the transaction to take this form which would result in the desired tax savings to Clayton, and which would accomplish the objectives of Creech Bros. and McAshan, and on October 25, 1955 the following agreements were entered into:

1. Creech Bros. executed an option to sell the property to McAshan for $65,000, simultaneously assigned by Mc-

Ashan to Clayton, who immediately exercised the option, paid the purchase money and received a deed from Creech Bros. to the property which was duly placed of record.

2. Clayton thereupon executed a lease of the property to McAshan for a term of five (5) years which contained an option to McAshan to purchase the property at any time after six months and prior to the expiration of twelve months at a price of $110,000, payable in installments over a period of years, and less certain credits.

3. McAshan purchased from Creech Bros. and their wives certain personal property and equipment, receiving as a credit on the purchase price the $15,000 which McAshan had originally paid to Creech Bros. under the August 1953 agreement. Immediately thereafter, McAshan assumed operation of Dixie Land as a proprietor, under the terms of his lease from Clayton, and continued to operate same until November 1, 1956, at which time he exercised his option to purchase the property and consummated the purchase by execution of the note in the amount of $106,524.01, secured by purchase money trust deed thereon, and received a warranty deed to same from Clayton, subject only to the prior deed of trust to Busch.

On January 1, 1957, McAshan and wife caused the corporation Jemc's, Inc., to be formed,[1] and recited in the corporate minutes that he transferred to it the personal property he had acquired from Creech Bros. (although apparently no bill of sale was executed). It was this newly formed corporation which thereafter conducted the business of Dixie Land Restaurant, occupying McAshan's realty as tenant. McAshan continued to own

---

[1] The Chancellor found this date to be January 1, 1956 but a careful reading of McAshan's testimony seems to fix it as above stated.

the real estate until after Jemc'c, Inc., became involved in financial difficulties and only conveyed it to the corporation on December 9, 1958 shortly prior to an attempt to obtain a reorganization of the corporation in the Bankruptcy Court, upon the failure of which the general creditors' bill was filed on January 7, 1959. This December 9, 1958 conveyance of the McAshan realty to the corporation was by a quit-claim of McAshan's equity in the property, subject to the prior deed of trust indebtedness, and McAshan took the corporation's note in the amount of $21,386 in return for his equity in the property, which note is recited on its face to be subordinate to all other debts of the corporation. At that time there were three deeds of trust on the realty, the first to secure the balance of the Busch debt, the second securing the Clayton note for $106,381, and a third securing an $8,000 note of the corporation to Greer & Company, on which McAshan was endorser. McAshan has filed his claim against the corporate assets in the present proceeding. The questions raised through appropriate assignments of error are as follows:

1. Was the Chancellor correct in holding that the receiver of Jemc's, Inc., has the right to purge the transaction between McAshan (stockholder and predecessor in title of Jemc's) of alleged usury for the benefit of corporate creditors?

2. Was the Chancellor correct in holding that the transaction involved contained usury?

3. Was the Chancellor correct in holding that the transaction involved constituted an "unjust enrichment" which equity would relieve against at the instance of the receiver for corporate creditors?

. It may be stated at the outset that a large number of exceptions filed by intervenor, Western Avenue Realty Company, to the Master's report on order of reference were sustained by the Chancellor. Exception 11 of the intervenor was the only exception overruled, the decree reciting "the Court agreeing with the Master that the $45,000, as admitted by Clayton was a forbearance of the indebtedness of $65,000 for a period of years, and by definition, was usurious". This is therefore the only relevant concurrent finding adverse to appellant's contentions.

We first confront the question of the right of the receiver for Jemc's, Inc., to raise the defense of usury. It should be noted that this right is purely statutory, and unless conferred by statute does not exist. 55 Am. Jur. p. 324; Stump v. Napier, 10 Tenn. 35, 41. Our statute provides:

T.C.A. Sec. 47-1617. "Usury paid—Recovery of.— If usurious interest has been paid, the same may be recovered by action, at the suit of the party from whom it was taken, or his representative; or it may be subjected by any judgment creditor of such party to the satisfaction of his debt."

Thus the rule is stated that the right to plead usury is a privilege personal to the debtor, the exceptions embracing only "the debtor's sureties, guarantors, heirs, devisees, and personal representatives". Parker v. Bethel Hotel Company, 96 Tenn. 252, 289, 34 S. W. 209, 31 L. R. A. 706; Williams v. Boyd, 2 Tenn. App. 111.

While there is not unanimity of opinion among the courts which have considered the question it seems generally to be held that the purchaser or grantee of property subject

to an allegedly usurious lien or encumbrance is precluded from setting up usury as a defense, or from purging the lien therefrom, the reasoning being that the prior debts were deducted from the purchase money and thus in effect had been included in the purchase price. 91 C. J. S. Usury sec. 130, pp. 718-719; 55 Am. Jur. pp. 415-417. Cited in the latter work in support of the rule stated is Nance v. Gregory, 74 Tenn. 343, in which realty was purchased at a sale by the assignee in bankruptcy of the owner, subject to a prior lien securing a debt alleged to contain usury. The Court's opinion includes the following pertinent comment (at page 345):

"The question presented on this aspect of the case is, whether the purchaser at an assignee's sale of property incumbered with a mortgage for a specified sum, of which all parties have notice by law, can afterwards file his bill, on the simple footing of purchaser, to get clear of the usury in the debt secured by the mortgage.

"A majority of the court think he cannot.

"It is ingeniously argued that such a purchaser stands in the shoes of the assignee, who stands in the shoes of the bankrupt, therefore he has all the rights of the bankrupt in reference to the property.

"This is plausible, but is not sound and fairly the fact of the case. The bankrupt is the original contractor of the debt, and is relieved in a court of equity on the ground that, though he is equally participant in the violation of law, he is an oppressed debtor in vinculis in the power of the lender, and, therefore, the principle on which the relief rests is the protection of borrowers against oppressive exactions by

lenders: Bensley v. Homier, 42 Wisc. [631], 635. This is all very well settled and understood. Whenever the borrower comes into a court of equity for relief against usury he is backed by the consideration referred to, and is entitled to the proper relief.

"But does the purchaser of property encumbered by a mortgage given to secure a debt tainted with usury, stand on the same ground? We take it, that it is almost too clear for argument that he does not."

and at page 351:

"For the reasons we have given, we think, as applicable to a case like the present, the principle thus announced is the correct one, and is sustained both by principles as well as the weight of authority. As the purchaser in such a case does not come within the principle on which a court of equity gives relief against usury, he must be repelled, unless the statutes of our State give him a remedy. It is certain no such right is given by our Code. The plea of usury is allowed in favor of the original debtor, his surety, accommodation endorser, or his personal representative, by sec. 1951 of the Code, and the judgment creditors of the debtor, by sec. 1955, but to no one else."

█ The estate being administered here for the benefit of creditors is that of the corporation Jemc's, Inc., for which corporation and its creditors the receiver acts. It can hardly be doubted that the receiver would have the right to have purged of usury any obligation asserted against the estate of this debtor. Nance v. Gregory, supra at page 347; Annotations 82 A. L. R. 1008, 1016 and 134 A. L. R. 1335. But intervenor does not assert a debt against the estate of Jemc's, Inc., nor against any assets

in law or in equity belonging to Jemc's, Inc. Its petition was to enforce its in rem lien against the realty, the equity in which had been quit-claimed to the corporation, and by decree this in rem right is now to be asserted against the proceeds of sale of the realty. The Chancellor apparently avoided the effect of the rule just stated by treating James E. McAshan and Jemc's, Inc., as one and the same entity in law, thus conferring upon the receiver for the corporation the right of McAshan to make the question of usury, for the benefit of corporate creditors. Cited as justifying this disregard of the separate legal identity of corporation and stockholder is the fact on November 1, 1956 McAshan gave to Clayton, as additional security for the $106,381 note, a chattel deed of trust on fixtures, equipment and personal property which assets the organization minutes of Jemc's, Inc., had recited as having been transferred by McAshan to the corporation. McAshan explained this incident as inadvertent error and there is nothing in the record to indicate that the corporation was not legally organized or that it did not function properly throughout the times here material as an entirely separate and independent legal entity. On the contrary the record reflects the fact that a large number of creditors have dealt with and extended credit to the corporation rather than to McAshan, and as is hereinabove shown, the creditors' bill was dismissed as to McAshan by decree reciting that he had no individual liability for the numerous corporate debts. Moreover, McAshan himself, except on the single occasion referred to, was scrupulous in his treatment of the corporation as a separate entity. As shown by his petition filed herein and the Exhibits thereto, McAshan took security from Jemc's for the debts which it owed him, took a purchase money note from it on the occasion

of his conveyance of December 9, 1958, and deposited some monies advanced to it in the separate bank account of "Jemc's, Inc., d/b/a Dixie Land Drive In Restaurant."

A corporation is usually treated as a separate entity. For examples in our cases see Parker v. Bethel Hotel Co., 96 Tenn. 252, 278, 34 S. W. 209, 31 L. R. A. 706; Haverty Furniture Company v. Foust, 174 Tenn. 203, 212, 124 S. W. (2d) 694; Hinton v. Carney, 194 Tenn. 262, 264-265, 250 S. W. (2d) 364; Fletcher on Corporations, Vol. 1, Sec. 25.

The separate entity will be quickly disregarded, however, upon a showing that the corporation is a mere sham or dummy, or where necessary to accomplish justice. Fidelity Trust Co. v. Service Laundry Co., 160 Tenn. 57, 22 S. W. (2d) 6. This has occurred in a variety of situations, as where necessary to effectuate the intent of a testator in the case just cited, and in Baldwin v. Davidson, 37 Tenn. App. 606, 267 S. W. (2d) 756; or where the corporation is in effect the agent of the stockholders. Towles & Co. v. Miles, 131 Tenn. 79, 173 S. W. 439, or to fasten liability on a parent corporation where it exercises such control over its wholly owned subsidiary as to render it a puppet. Dillard & Coffin Co. v. Richmond Cotton Oil Co., 140 Tenn. 290, 291, 204 S. W. 758; Tennessee Consol. Coal Co. v. Home Ice & Coal Co., 25 Tenn. App. 316, 156 S. W. (2d) 454; Diogo v. Holland, 3 Cir., 243 F (2d) 571; or to prevent a fraud, Dale v. Thomas H. Temple Co., 186 Tenn. 69, 208 S. W. (2d) 344; Madison Trust Co. v. Stahlman, 134 Tenn. 402, 183 S. W. 1012; E. O. Bailey & Co. v. Union Planters Title Guaranty Co., 33 Tenn. App. 439, 232 S. W. (2d) 309; or where construction of a contract in the light of circumstances is

deemed to justify. American Indemnity Co. v. Southern Missionary College, 195 Tenn. 513, 260 S. W. (2d) 269, 39 A. L. R. (2d) 714. The cases cited are but illustrative but we find none in which the corporate entity is disregarded except to prevent injustice, which element appears to us to be completely lacking in the case at bar.

The situation might be different if there were an attempt here to assert the individual liability of McAshan for corporate debts. There is none. Nor is there claim that any of the creditors were in any wise misled by the apparent ownership of the property in question by the corporation. As above noted, the corporation took title to the equity subject to lien indebtedness, on December 8, 1958, a time *after* all claims of creditors had accrued. Since the claim of McAshan to purge the Clayton note of alleged usury did not pass to the corporation there is no more reason to subject it to claims of corporate creditors than there would be to subject any other individually owned property of McAshan to such claims, and since he has been exonerated from liability for corporate debts we can find no basis on which to sustain such a result.

It would be fatal to corporate creditors to disregard the corporate entity entirely for it is the only entity to which they extended credit, their only debtor, and it is hardly possible to accept the corporation for some purposes and to ignore it for others.

The same facts, and the same reasoning, render logically unacceptable the holding that Western Avenue Realty Company, Inc., has been unjustly enriched at the expense of Jemc's, Inc., or its creditors. The fact is that intervenor never had any dealing of any nature or kind

with Jemc's, Inc., and has neither taken nor proposes to take anything which in law or in equity belongs to it, and hence does not aggrieve the creditors of this corporation whom the receiver represents. No wrong appears to either corporation or its creditors which would cause a court of equity to declare a constructive trust or use some other accepted equitable device for accomplishing justice. Intervenors "enrichment" appears to have been at the expense of Creech Bros., who were forced to make a distress sale of their realty to gain cash in a market limited by the existence of the outstanding McAshan option. It plainly was not at the expense of Jemc's, Inc., or of its creditors and no method is perceived by which the "enrichment" can be properly applied to their claims.

Since we must conclude that the Court below was in error in holding that the receiver had the right to make the question of usury and unjust enrichment it becomes unnecessary to consider the question of whether the transaction attacked was in fact usurious and we express no opinion upon it.

For the reasons stated the decree of the Chancellor will be reversed, insofar as it adjudges that the receiver had the right to assert usury and unjust enrichment and therefore insofar as it adjudges such transaction to have been usurious, and the cause remanded for further appropriate proceedings, with costs against the receiver.

Reversed.

McAmis, P.J., and Hale, J., concur.