**TENNESSEE RACQUETBALL INVESTORS, LTD., Plaintiff-Appellee,**

v.

**Robert L. BELL, Defendant-Appellant.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Feb. 21, 1986.

Application for Permission to Appeal
Denied by Supreme Court
April 28, 1986.

Thomas V. White, Tune, Entrekin & White, Nashville, for defendant-appellant.

W. Gary Blackburn, Barnett & Alagia, Nashville, for plaintiff-appellee.

## OPINION

TODD, Presiding Judge, Middle Section.

The defendant, Robert L. Bell, has appealed from a jury verdict and judgment of $45,764.65 in favor of the plaintiff, Tennessee Racquetball Investors, Ltd.

Appellant's first issue is as follows:

I. WHETHER A CORPORATE DIRECTOR WHO DID NOT PERVERT THE CORPORATE ENTITY SO AS TO PERPETRATE A FRAUD, WRONG, OR BREACH OF POSITIVE LEGAL DUTY MAY BE HELD PERSONALLY LIABLE UNDER AN "ALTER–EGO" THEORY TO A CREDITOR WHICH HAS RECOVERED ALL LOSSES PROXIMATELY CAUSED BY THE ALLEGED WRONGFUL ACT.

This issue is interpreted to question whether the evidence, viewed in the light most favorable to plaintiff, is legally sufficient to support the verdict of the jury. The jury heard evidence supporting the following facts:

Plaintiff, a limited partnership with Andrew Pearl as general partner, is the owner of realty improved for use as a "racquetball center". On August 10, 1978, plaintiff, leased said property to Perlmac, Inc. for a term of 30 years. The lease was signed: Tennessee Racquetball Investors, Ltd. by G. Andrew Pearl, general partner, and Perlmac, Inc., by G. Andrew Pearl, president. Perlmac occupied the premises until June 30, 1979, at which time Perlmac agreed to assign the lease to Supreme Court Racquetball Club Ltd., (SCRC) a corporation of which the entire capital stock was owned by defendant, Bell. A "Letter of Intent", signed by Pearl for Perlmac and Bell for SCRC provided that Perlmac would sell and SCRC would buy all the assets of Perlmac for $125,000 payable $25,000 cash and balance represented by "non recourse note" of SCRC payable in monthly installments for 20 years. It is uncontradicted that Pearl was aware that the asignee of the lease, the purchaser of the assets and the maker of the note was SCRC, a corporation. The note was endorsed by Perlmac to plaintiff.

In the fall of 1980, SCRC became delinquent in its obligations, including rent on the premises and installments on the note and other obligations. One such obligation was a note due First American National Bank. On October 17, 1980, SCRC, with the guaranty of Bell, borrowed $15,700 from Commerce Union Bank which was used to satisfy the First American Bank note. The note to Commerce Union Bank was paid by SCRC.

On October 29, 1980, plaintiff sued SCRC for amount due on its note and lease and for possession of the premises. On January 14, 1981, an agreed order awarded plaintiff judgment against SCRC for $70,000 due under the lease and note and for possession of the premises.

On January 29, 1981, plaintiff filed a petition for involuntary bankruptcy against SCRC, which petition was sustained; and a trustee assumed control of the assets of SCRC. The Trustee petitioned the Bankruptcy Court to require Commerce Union Bank to repay to the bankruptcy estate the amount paid by SCRC to Commerce Union on the $15,700 note as an unlawful preference of a creditor. Under an agreement approved by the Bankruptcy Court to settle the claim against Commerce Union, defendant paid $4,000.00 to the Trustee and subrogated his claims against the estate to the claims of all other creditors, and the Trustee released Bell from further liability to the bankruptcy estate.

Thereafter, plaintiff brought the present suit against defendant, Bell, on three grounds:

1. That Bell was the "alter ego" of SCRC and as such, was liable for all its obligations.

2. That Bell violated TCA § 47–50–109 by "tortiously, willfully and maliciously" inducing SCRC to violate its lease agreement and default in payment of a note due plaintiff.

3. That Bell committed abuse of legal process by causing SCRC to file denials in bad faith, willfully and maliciously.

A jury verdict and judgment were entered on the first ground for $45,764.65, and verdict was directed for the defendant as to the second and third grounds.

The pretrial order, to which no exception is taken, states:

Based upon the discussions with counsel, the Court concludes that the plaintiff's first claim will be submitted to the jury on the alter ego theory and not on the trust fund or fiduciary theory which gives the creditor a direct cause of action against a shareholder or officer.

In *Neese v. Fireman's Fund Ins. Co.* 53 Tenn.App. 710, 386 S.W.2d 918 (1964), Fireman's Fund was surety on a bond guaranteeing the fidelity of Real Estate Management, Inc. (REMCO) in respect to accounting for rents collected. First Trust Company (FTC) claimed indemnity from Fireman's Fund for failure of REMCO to account for rents collected for FTC. Both FTC and REMCO were in bankruptcy. The two companies were principally owned and wholly controlled by a single family, and the officers and directors were generally the same. Fireman's Fund defended on the theory that the two companies were indistinguishable because of common control and free intermingling of funds. This Court affirmed a judgment in favor of Fireman's Fund and said:

... First Trust Company is entitled to recover on the bond, unless, as insisted by defendant, the relationship of the two corporations was such that they should be treated as a single entity.

It is generally recognized that a corporation is a separate entity; however, where there is a showing that the corporation is a mere sham or dummy, or is being used to defeat public convenience, justify wrong, or protect fraud, the corporate entity will be disregarded. [Citing authorities.]

....

"The separate entity will be quickly disregarded, however, upon a showing that the corporation is a mere sham or dummy, or where necessary to accomplish justice. *Fidelity Trust Co. v. Service Laundry Co.*, 160 Tenn. 57, 22 S.W.(2d) 6. This has occurred in a variety of situations, as where necessary to effectuate the intent of the testator in the case just cited, and in *Baldwin v. Davidson*, 37 Tenn.App. 606, 267 S.W.(2d) 756; or where the corporation is in effect the agent of the stockholders. *Towles Co. v. Miles*, 131 Tenn. 79, 173 S.W. 439, or to fasten liability on a parent corporation where it exercises such control over its wholly owned subsidiary as to render it a puppet. *Dillard & Coffin Co. v. Richmond Cotton Oil Co.*, 140 Tenn. 290, 291, 204 S.W. 758; *Tennessee Consol. Coal Co. v. Home Ice & Coal Co.*, 25 Tenn.App. 316, 156 S.W.(2d) 454; *Diogo v. Holland*, 3 Cir., 243 F.(2d) 571; or to prevent a fraud, *Dale v.*

*Thomas H. Temple Co.,* 186 Tenn. 69, 208 S.W.(2d) 344; *Madison Trust Co. v. Stahlman,* 134 Tenn. 402, 183 S.W. 1012; *E.O. Bailey & Co. v. Union Planters Title Guaranty Co.,* 33 Tenn.App. 439, 232 S.W.(2d) 309; or where construction of a contract in the light of circumstances is deemed to justify. *American Indemnity Co. v. Southern Missionary College,* 195 Tenn. 513, 260 S.W.(2d) 269, 39 A.L.R.(2d) 714. The cases cited are but illustrative but we find none in which the corporate entity is disregarded except to prevent injustice...."

....

In the present case, we think the evidence paints a picture of domination and control of the finances, policies and practices of both the parent corporation (First Trust Company) and the subsidiary corporation (REMCO) by Scott N. Brown, the majority stockholder and principal executive officer of both companies. This domination was so complete that neither corporation had any mind, will or existence of its own. Mr. Brown conducted the affairs of both corporations as though they were one company individually owned by him. The finances of each were treated as the finances of the other, and funds were transferred between the two companies indiscriminately so that their bank accounts amounted to a single treasury. Hiring for both companies was usually done by the same person. A number of employees of each corporation did work for the other. For several years and until January 1, 1962, the employees of both companies were paid on checks of REMCO; after that, all employees were paid on checks of First Trust Company. The two corporations were so integrated that they not only shared the same office space, they had the same phone number.

From the above evidence, we have concluded that First Trust Company and REMCO were "identical or indistinguishable in fact." (53 Tenn.App. p. 717–719, 386 S.W.2d 918)

It appears that the real question in the cited case was whether the creditors of one bankrupt corporation can claim a compensable default by another corporation when the two corporations are indistinguishable as to ownership, control and funds.

In *Dillard and Coffin Co. v. Richmond Cotton Oil Co.,* 140 Tenn. 290, 204 S.W. 758 (1918), it was undisputed that Buckeye Cotton Oil Company operated Richmond Cotton Oil Company as its fully owned and controlled instrumentality, and that Richmond Cotton Oil Company operated Planter's Gin Company as its fully owned and controlled instrumentality. During this relationship, Planter's Gin incurred indebtedness to plaintiffs, Dillard and Coffin Co. who were assured that Planter's was the business of Richmond and that Richmond would pay Planter's debts. The one who made this assurance was the manager of Richmond who was on the payroll of Buckeye. The Supreme Court held that both Buckeye and Richmond were liable for the debt of Planter's under these circumstances.

In *T. Towles & Company v. Miles* 131 Tenn. 79, 173 S.W. 439 (1915), Towles, a partnership, obtained the general contract for construction of a 25 mile section of railroad. The partnership organized a corporation named Straley & Co. and subcontracted 4 miles to Straley & Co. However, the partnership retained and exercised daily direction over the servants of Straley in carrying out the subcontract. Miles was injured on the Straley job and sued the owners, Towles, apparently in a tort-personal injury case. The Supreme Court rejected the defense of independent contractor and held Towles liable. It is seen that the rationale of this decision is that the negligence of the employees of Straley was imputed to Towles because they were acting under the direction of Towles.

In *Continental Bankers Life Ins. Co. v. Bank of Alamo* Tenn. 1979, 578 S.W.2d 625, People's Protective Life Ins. Co. purchased a $50,000 certificate of deposit from Bank of Alamo. When sued by Continental on the certificate, the Bank pled set off of a debt due it by the parent corporation of

People's Protective on the theory of "instrumentality" or "domination" of Peoples by the parent. The Supreme Court reversed a judgment in favor of the bank, entered judgment in favor of Peoples and said:

Paraphrased from *Lowendahl [v. Baltimore & O.R. Co.,* 247 App.Div. 144, 287 N.Y.S. 62 (1936)], application of the instrumentality rule requires proof of the following three elements:

(1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.

(2) Such control must have been used to commit fraud or wrong, to perpetuate (sic) the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Tennessee Consol. Coal Co. v. Home Ice & Coal Co.,* 25 Tenn.App. 316, 156 S.W.2d 454 (1941) involved a question of priority between Roberts and the successor corporation to Independent Life Insurance Company in a general creditors proceeding. Independent came into possession of real estate and personal property upon a loan default and found it expedient to protect those assets by organizing and controlling the Home Ice and Coal Company. That corporation later became insolvent, and its assets were administered in Davidson County Chancery Court. In the trial court, the claim of the parent corporation, Independent, was subordinated to the claims of all creditors, including Roberts, on the grounds that Home Ice and Coal Company was a mere "agency or instrumentality" of Independent. Independent accepted that result as to all creditors except Roberts, maintaining on appeal that Roberts was not misled, deceived or defrauded because he was president of Independent when it organized and dominated the operation of Home Ice and Coal Company. The Court of Appeals affirmed Roberts' priority citing strong equitable considerations: that the money advanced by Roberts, personally, was used for operating expenses by the subsidiary and directly benefitted the parent as the proof showed that it had already received $13,000 out of the subsidiary's properties, which were worth only $3,000 or $4,000 when the corporation was organized. The Court of Appeals held that:

"By the ordinary rules of principal and agent, the Independent as principal is liable to Roberts for the acts of its agent within the scope of the agent's authority. It is not denied that the sums he advanced and the loan procured on the pledge of his stock were received by the agent and used in the operation of the business, and thus went directly for the benefit of the Independent. The business was really the Independent's business, and the money advanced by Roberts for operating expenses of the business should be treated as advancements to the Independent." 25 Tenn.App. at 322, 156 S.W.2d at 458.

However, that Court also stated the following principle, apparently in reference to the application of the instrumentality rule:

"It is not necessary for one to show that he has been misled, deceived or actually defrauded, to enable him to invoke this rule. It is enough that the parent corporation's domination of the subsidiary was so complete as to make them practically indistinguishable or to make the subsidiary a mere tool, agency or instrumentality of the parent; and that he will suffer loss unless the parent be held." 25 Tenn.App. at 321, 156 S.W.2d at 458.

That statement was unnecessary to sustain the result in favor of Roberts.

In a factual situation involving priority among creditors, the courts are inclined

to require less dominion of corporation operations and little equity; where, as here, the transaction attacked involves a direct contractual relationship, the proof required is more stringent. We agree with the result reached in *Home Ice & Coal Co.* but do not agree that the instrumentality rule was appropriately used or stated therein. (578 S.W.2d p. 632–633)

Appellee cites a number of authorities holding that officers and directors must exercise the utmost of good faith in transactions with their corporations, but these authorities are not deemed helpful within the narrow context of the issue in this appeal, i.e., whether Bell is liable for all of the debts of the corporation or whether he is liable to plaintiff because the indebtedness or liability of SCRC was incurred under circumstances in which SCRC was the "alter ego" of Bell.

■ The present case does not involve a transaction between Bell and his corporation. It involves a transaction between his corporation and plaintiff's assignor (the lease and note). There is no evidence that, at the time of the creation of the debt claimed by plaintiff, there was any ground for plaintiff to believe that it was in reality dealing with Bell. On the contrary, it was clearly understood that the corporation SCRC was created specially to deal with plaintiff in lieu of Bell. Plaintiff's only complaint is that Bell instructed the corporation to pay another creditor instead of plaintiff. If he had instructed the corporation to pay plaintiff instead of still another creditor, would that slighted creditor have recourse against Bell for its debt? The answer is obvious.

The only improper act of Bell was to instruct the corporation to prefer one creditor in violation of the bankruptcy act. The remedy for this impropriety was pursued by the Trustee in Bankruptcy on behalf of all creditors by suing for return of the preferential payment. This suit was settled with the approval of the bankruptcy court. Provident or improvident, this was a conclusive disposition of any rights arising out of the preference.

While it is true that Bell exercised dominance over SCRC, mere dominance, standing alone, does not render Bell liable for the corporate debts. Two other elements are required to fix liability upon Bell, i.e.:

(2) Use of control to commit fraud or wrong, to perpetuate (perpetrate) the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.

(3) The control and breach of duty must proximately cause the injury or unjust loss complained of. *Continental Bankers Life v. Bank of Alamo*, supra.

No evidence is found in this record to support requirements (2) and (3), above.

*Oak Ridge Auto Repair Service v. City Finance Co.* 57 Tenn.App. 707, 425 S.W.2d 620 (1967) is a rather complicated tangle of facts which are not at all comparable with the facts of the present case. Oak Ridge Auto Repair Service, was a mere trade name used by W.H. Thompson, from whom City Finance Company sought damages "in detinue" for disposal of two automobiles and tools on which City Finance held a mortgage. Thompson had joined Henderson and wife in forming Henderson Auto Repair Service, Inc. The Hendersons' contribution to the corporation was the two automobiles and tools, which were mortgaged to City Finance. The Hendersons disappeared, City Finance sought possession of the security. Thompson refused to surrender the chattels. City Finance sued Thompson and Oak Ridge (his trade name) in detinue. Between suit and trial, Thompson used the automobiles and tools "in his business" (not the business of the corporation, Henderson Auto Repair Service). Thompson sold the tools for $1,100.00 and the automobiles were sold as junk for $50.00. Although Thompson insisted that sole responsibility for the loss of the chattels rested upon the defunct corporation, this Court said:

... After the Hendersons skipped town and Thompson was given actual notice of the prior lien which City Finance Compa-

ny, Inc. held against the motor vehicles and mechanics tools, the defendant Thompson thwarted the efforts of City Finance Company, Inc. to have foreclosure of its chattel trust and refused to give up possession of the property. His sole excuse for refusing to surrender possession of the property was that he was preserving the assets of the corporation. Later, he sold some of the equipment to an associate, Poole. So far as the meager record before this court indicates, Henderson Auto Repair Service was at most a mere instrumentality or agency of W.H. Thompson. He was the sole stockholder. So far as this record shows Henderson Auto Repair Service, Inc., did no acts separate and apart from the acts of its sole stockholder and owner, W.H. Thompson. It would be a palpable injustice to permit Mr. Thompson to use the corporate entity as a shield for thwarting City Finance Company, Inc. in the foreclosure of its chattel trust. (57 Tenn.App. at 711, 425 S.W.2d 620)

It is seen that Thompson committed an overt, knowing conversion of the security of City Finance, for which he was properly held liable. In the alternative, his corporation committed the same tort through him as its instrumentality. It is hornbook law that the active agent committing a tort is jointly liable with his principal who is vicariously liable. No comparable facts are found in the present case, wherein SCRC was bound in contract to plaintiff. Bell was not. Plaintiff's rights arise out of its contracts with SCRC, and plaintiff's only complaint against Bell is that, as controller of the corporation, he caused the corporation to pay others than plaintiff and prevented the corporation from paying plaintiff.

In all of the cited cases, the rights of the creditor arose from some fraud or misrepresentation at the creation of the contract, or some tortious misconduct of the controller executed through the agency of the controlled corporation. The present case is otherwise. This Court is unaware of any right to recover damages from one who induces a debtor to pay one creditor to the exclusion of another. If this were true, every collecting agency might be liable to unpaid creditors for a collection made on behalf of one creditor.

Appellee insists that Bell committed a fraud by violating his fiduciary duty to *creditors*. If this be true the action for such misconduct resides in *all* creditors, to be exercised by the trustee in bankruptcy who has released all claims against Bell.

Appellant points out that Bell wrongfully caused the corporation to exonerate him by paying a bank loan for which he was responsible. This liability to the corporation or its creditors has likewise been released by the bankruptcy trustee.

■ Where the controller of a corporation has been released by the trustee in bankruptcy from all liability to the estate of the corporation (i.e. the creditors of the corporation); no right of action remains in any creditor against the controller except for a special wrong committed against a particular creditor to the exclusion of creditors in general. Such a special wrong against plaintiff to the exclusion of other creditors is not shown by the evidence in this case.

The first issue of appellant is resolved in favor of appellant, the judgment will be reversed and plaintiff's action on the first ground (alter ego) will be dismissed.

This disposition renders moot the appellant's other two issues (charge on interest and failure to act as 13th juror) which are pretermitted.

Plaintiff-appellee presents two issues of which the first is as follows:

1. Whether the Trial Court erred in finding that Dr. Bell was not liable for the liquidated debt of the corporation, should the jury find that the corporate entity should be disregarded.

Appellee's brief fails to state with particularity wherein and how the Trial Court held defendant "not liable for the liquidated debt of the corporation", as required by Rule 6(b) of the Rules of this Court. Apparently, appellee conceives that, if ap-

pellee is not entitled to recover apart from a class action on behalf of all creditors, then the judgment against defendant should include a recovery of the unpaid debts of all of the creditors of SCRC. If this be true, it must be pointed out again that, whether providently or improvidently, the bankruptcy court has authorized the trustee to compromise and settle all liability of Bell to creditors generally, and this has been done. This effectively eliminates the possibility of a general recovery for all creditors and leaves only such separate, special and peculiar rights which a creditor or creditors may have for special wrongs producing special damages to an individual creditor. For example, if Bell had represented to a particular creditor that the corporate name was a mere trade name for his individual business, the particular creditor might pursue its remedies against Bell. Likewise, if a creditor had a security interest in property held by SCRC and Bell had caused the corporation to wrongfully dispose of such property, then such creditor might pursue its remedies against Bell as in *Oak Ridge v. City Finance*, supra. No such special right to proceed is shown in this case, and the general rights of all creditors have been extinguished by action of the bankruptcy court and trustee.

No merit is found in appellee's first issue.

Appellee's second issue is as follows:

2. Whether the Trial Court erred in directing a verdict upon the issue of abuse of process.

■ The factual basis for appellee's suit for "abuse of process" appears to be as follows:

1. Bell instructed SCRC to make no payments to plaintiff without his approval, which was not given.

2. On October 29, 1980, Bell's attorneys received plaintiff's complaint seeking possession of the leased property. On December 1, 1980, counsel for SCRC filed an answer denying breach of the lease. Such answer delayed the plaintiff in obtaining possession of the premises until January 14, 1981, at which time an agreed order was entered awarding possession to plaintiff.

3. Between December 5, 1980 and January 14, 1981, $6,000 was paid by SCRC to Commerce Union Bank upon the debt secured by Bell.

In short, Bell is accused of conniving with his corporation to delay the process of repossession of the leased property to enable the corporation to continue operation and thereby pay the debt of the corporation which was secured by Bell.

In ruling upon the motion for directed verdict on this phase of the suit, the Trial Judge stated orally from the bench:

> ... [A]ssuming that an untruthful answer was filed and assuming that a shareholder of the corporation can be held liable for that, there is no evidence before the jury that that caused harm, proximately caused harm to the plaintiff. And I don't know what to do other than testify myself because there's nobody that I know of that can really truthfully say what goes on and how things are operated in Part III of the Chancery Court other than the people who work here, and that happens to be me, among other people.
>
> We have service of process on October the 30th, 1980. The last day for filing an answer was Friday, November the 29th.... [T]he defendant could have filed an answer anywhere up until the close of business hours on up until midnight, actually on the 29th of November, which is a Friday. The earliest possible time that Mr. Trentham could have gotten a motion for default judgment heard ... would have been December the 12th;
> ...
>
> Assume that the order granting that motion for default judgment or motion on the pleadings was submitted to the Court on the next business day, Monday, the 15th of December.... and presumably entered on the 18th day of December. Under the Rules of Civil Procedure, no action can be taken to enforce a judgment until 30 days after it is entered,

and, therefore, no enforcement of the judgment could have taken place until January the 19th.

... [W]hat actually happened in this case is quicker than it would have been had this corporation not filed any response to the lawsuit at all or filed an answer denying the lawsuit, I mean admitting the liability. (Tr Vol. II p. 345–347)

The Trial Judge took judicial notice of and put into the record facts which are uncontroverted and which negative the relationship of proximate cause between the alleged misconduct (filing an answer) and the claimed loss (lost payments from corporation between the answer and delivery of possession of premises to plaintiff).

No merit is found in appellee's second issue.

The judgment in favor of plaintiff is reversed, and plaintiff's suit is dismissed. All costs, including costs of this appeal are taxed against plaintiff. The cause is remanded for collection of costs and any other proceedings which may be necessary and proper.

Reversed, dismissed and remanded.

LEWIS and CANTRELL, JJ., concur.